HENRY W. PUTNAM *v.* SELIG S. FISHER AND ANOTHER.

## *Evidence.   Hearsay.*

In case for erecting a dam higher than defendants had a right to erect, and thereby causing water to flow back upon plaintiff's premises, it became material to determine whether the dam was higher than the original dam. The dam complained of was thereby brought into comparison with the dam that preceded it, which was itself preceded by the original dam. It appeared that the grantor of those through whom defendant and plaintiff derived their respective titles, after having conveyed by warranty deed to those through whom those titles were derived, and while having no title to the dam nor to the privilege therewith connected, but while owning other land bordering on the pond raised by the dam, and while liable on his covenants of warranty, went onto the dam preceding the dam complained of, and cut away a portion thereof. Such grantor being dead, plaintiff offered to prove that while he was cutting down the dam he said it was too high. *Held*, not within any exception to the rule excluding hearsay, and inadmissible.

CASE for erecting a dam higher than defendants had a right to erect, and thereby causing water to flow back upon the plaintiff's water-wheel.   Plea, the general issue, and trial by jury, December Term, 1877, Bennington County, DUNTON, J., presiding.

It appeared that on January 23, 1836, Jedediah and Eldad Dewey, who were then joint owners of certain land along a stream and a water privilege connected therewith, by deed of warranty of that date conveyed to Asahel Booth and Joel Spaulding a portion of said land, with the right of maintaining a dam on their land above the portion so conveyed, on the site of a dam that had theretofore existed and been used in connection with said privilege for the purposes of a grist-mill but had been swept away, and to the height of the old dam.   In the course of that and the following year, Booth and Spaulding erected a dam, which there was evidence tending to show was of the same height as the original dam, a flume, factory, &c., under their deed ; and after several mesne conveyances, that property, with all the privileges therewith connected, was, on May 22, 1874, conveyed to the defendants.   On December 1, 1835, the Deweys, by an indenture that was not recorded till July 14, 1836, leased to Lemuel Grover for a thousand years, a parcel of land near the stream and above the site of said dam, and on July 27, 1836, they conveyed to him by deed of warranty the right to dig ditches from the land so leased, westward through land still owned by them, and lying between the leased land and the land conveyed to Booth and Spaulding, to the east or upper edge of the pond raised by said dam, to be used as race-ways in connection with a water privilege that was used in connection with the leased land.   Grover dug a ditch in accordance with said deed, which was afterwards used as a race-way ; and on January 18, 1865, he conveyed to the plaintiff's wife all the rights he had acquired from Dewey by the last-named deed.   The plaintiff's wife afterwards acquired title to the land lying between the leased land and the stream, and north of said race-way, including the bed of the stream, and at some time, just when did not appear, she acquired title to the leased land also.   It was on this leased land that the plaintiff's dam, machine-shop, &c., were situated.   In 1867 the defendants'

grantor erected a new dam which was by the plaintiff asserted to be higher, and by the defendants to be lower, than the "prior dam". On that question there was conflicting evidence. The evidence introduced on the part of the plaintiff tended to prove that about 1846 said Jedediah, who had succeeded to all the interest of said Eldad in the lands in question, and who still owned lands bordering on the pond and affected by the rising of the water therein, but not the dam nor the land and rights conveyed to Booth and Spaulding as aforesaid, caused one Norton, his servant, to remove a portion of the planking of the dam "somewhat in the form of a circular segment about twenty inches in depth and about twenty-five feet in length." It appearing that said Jedediah was dead, Norton, who was improved as a witness, was allowed to testify that when he was sent out to do the cutting aforesaid, Jedediah, standing in full view of the dam, declared it was too high, and that when the witness had cut what he did, Jedediah told him he thought it was enough. This evidence was objected to by the defendants, and to its admission they excepted. It did not appear other than by implication that Booth or his partner knew that the dam was cut down as aforesaid, but there was evidence tending to show that it was not permanently repaired, where so cut, for about ten years. The court charged, among other things, that if the cutting down of the dam was known to the owners, and acquiesced in, the evidence relative thereto was material but not conclusive evidence of the height of the old dam.

*T. Sibley* and *Gardner & Harmon*, for the defendants.

Dewey's declarations were hearsay, and unless they fell within some exception to the rule, they should not have been received. They were not declarations against interest, nor in disparagement of the declarant's property, but otherwise. *Halloran* v. *Whitcomb*, 43 Vt. 306; *Smith* v. *Martin*, 17 Conn. 399; *Smith* v. *Powers*, 15 N. H. 546. If considered as the declarations of an adjacent owner as to the boundary, they are inadmissible. *Sullivan* v. *Lowder*, 11 Me. 426. They were not made before the rise of controversy. They were of opinion merely. *Davis* v. *Fuller*,

12 Vt. 178. They were not part of the `res gestœ.` *Lund* v.
*Tyngsborough,* 9 Cush. 36, 41 ; *Nutting* v. *Page,* 4 Gray, 581 ;
*Carlton* v. *Patterson,* 29 N. H. 580. They amounted to nothing
more than that the declarant claimed the dam was too high, but
there was no question of adverse possession on which such a claim
would have been material. *Perkins* v. *Blood,* 36 Vt. 273. They
were the narrative of a past transaction, and not evidence. *Worden* v. *Powers,* 37 Vt. 619. They were not admissible under the
rules established in *Wood* v. *Willard,* 37 Vt. 377, and *Powers* v.
*Silsby,* 41 Vt. 288, because of the declarant's interest to misrepresent. *Child* v. *Kingsbury,* 46 Vt. 47, and *Smith* v. *Powers,*
*supra.* The rule in *Wood* v. *Willard* has never been applied to
anything but a boundary.

*Davenport & Eddy* and *A. P. Lyman,* for the plaintiff.
The declarations were admissible as part of the *res gestœ.*
They characterized and explained the act of cutting down the
dam. *Ross* v. *Bank of Burlington,* 1 Aik. 43 ; *Danforth* v.
*Streeter,* 28 Vt. 490 ; *State* v. *Howard,* 32 Vt. 380 ; *Eddy* v.
*Davis,* 34 Vt. 209. They were admissible as the declarations of
a deceased person who had peculiar means of knowledge, made
when he had no interest to misrepresent, in the immediate vicinity
of the dam ; and because the original dam had been so long swept
away that there was no reason to suppose that living witnesses
could furnish evidence of its height. *Pettibone* v. *Rose,* Brayt.
77 ; *Wood* v. *Willard,* 37 Vt. 377 ; *Powers* v. *Silsby,* 41 Vt. 288 ;
*Miller* v. *Wood,* 44 Vt. 378 ; *Child* v. *Kingsbury,* 46 Vt. 47 ;
*Hadley* v. *Howe,* 46 Vt. 142. They were also admissible as evidence of the claim of the former owner under whom both parties
derived title. *Davis* v. *Judge,* 44 Vt. 500 ; *Wing* v. *Hall,* 47
Vt. 182 ; *Hale* v. *Rich,* 48 Vt. 217.

The opinion of the court was delivered by
POWERS, J. Prior to 1836, Jedediah and Eldad Dewey were
the owners of the lands and water privileges now owned respectively by the plaintiff and defendants. January 23, 1836, the
Deweys, by warranty deed, conveyed to Booth and Spaulding a

lot on the stream below the plaintiff's land, with the right to build
and maintain a dam of the same height as a former dam used in
connection with a grist-mill. The defendants stand upon this
Booth and Spaulding title. Afterwards the Deweys, by a lease
for a thousand years, conveyed to Grover the lot up the stream
from the defendants', on which the plaintiff now operates a ma-
chine-shop by means of water power. The Deweys also conveyed
to Grover, by warranty deed, the right of digging ditches over
other lands then owned by the Deweys, lying between the lands
leased to Grover and the lands conveyed to Booth and Spaulding,
to the east or upper edge of the pond raised by Booth and Spauld-
ing's dam. These ditches were to serve the purpose of race-ways
from the upper or Grover mill to said pond. The plaintiff stands
upon the Grover title, and brings this action for damages occa-
sioned by the defendants' raising their dam higher than the old
grist-mill dam, thus creating a back flowage of water through the
plaintiff's ditch upon his water-wheel.

At the trial it became a material question to determine whether
in point of fact the defendants' dam was higher than the old grist-
mill dam, and the plaintiff was allowed to show that in 1846 or
1847, Jedediah Dewey then having no title to the defendants'
dam or the land and privilege connected with it, but owning other
lands bordering upon the defendants' mill-pond, and affected by
raising the water of said pond, and liable upon the covenants of
warranty made in his deeds to both the plaintiff's and defendants'
grantors, went upon the dam then owned by Booth and Spauld-
ing, and cut away a circular segment about twenty inches deep
and twenty-five feet long, for the purpose of lowering the pond,
and was further allowed to prove the declarations of Dewey while
so cutting down the dam, to the effect that the dam was too high.
The admission of these declarations was error. To the general
rule that hearsay, or second-hand, evidence is inadmissible, there
are several well-defined exceptions, but the exceptionable evi-
dence is always guarded by some security that makes it reasonably
safe to rely upon it. Thus, the testimony of a witness on a former
trial between the same parties since deceased, may be proved by
persons who heard it. Such testimony, having been given in a

judicial proceeding, under oath, with opportunity for cross-examination, when properly proved, is always received as evidence in a subsequent trial of the same case. In matters of pedigree, the declarations of deceased members of a family, entries in family Bibles, correspondence between relatives, recitals in deeds, inscriptions on tombstones, rings and monuments, and many other similar facts are often admitted in evidence. In this class of evidence it must appear that the declaration, entry, &c., was made *ante litem motam*, by some one connected with the family who would be likely to know the fact, and likely to truthfully express it. Matters of public and general interest, such as ancient municipal boundaries, rights of common, and other historical facts are admitted in evidence from necessity, and may be established by ancient documents, declarations of deceased persons, &c., provided they are made before a controversy has arisen. This exception has been extended in this and some other states so far as to allow declarations of deceased persons to establish an ancient boundary line between individuals, though this is contrary to the English rule. *Wood* v. *Willard*, 37 Vt. 377 ; *Kinney* v. *Farnsworth*, 17 Conn. 355 ; *Smith* v. *Powers*, 15 N. H. 546 ; *The Queen* v. *Bedfordshire*, 4 E. & B. 535. But under the decisions in England and in this country, this evidence is hedged about with qualifications that must appear before it can be received. To establish an ancient boundary, whether of public or private property, by the declarations of deceased persons, it must appear that the declarations were made before a controversy has arisen in respect to the boundary, that the declarant had knowledge, or such connection with the subject-matter as presumptively to have had knowledge, of the fact, and can identify the boundary, and that the declarant had no interest to misrepresent the fact. The declarations of deceased persons are likewise admissible in evidence in proceedings between third persons, provided they were made against the pecuniary or proprietary interests of the declarant, and provided, further, that they do not question a title that the declarant had no right to question, such as the case of a tenant who cannot dispute the title under which he holds.

The declarations of Dewey when cutting down the dam, cannot

be brought within any of the exceptions to the general rule. The doctrine of *Wood* v. *Willard, supra,* has never been extended by our court beyond the case of a disputed ancient boundary line. It has not been applied to proof of other facts of ancient date. Even if the *fact* to be proved was one proper for the application of the rule admitting declarations, the essential conditions that must exist are not found in this case. One of the conditions recited in *Wood* v. *Willard,* as necessary for the admission of this class of evidence, is that the declarant has " no interest to misrepresent the fact." It is not stated that the declaration must be *against* interest, but that the declarant must stand at least indifferent in respect to interest. In this case Dewey's declaration was in favor of his own interest, and to hold it admissible would enable a party by his own declarations to make evidence for himself. Dewey was under a liability by virtue of his covenants of warranty ; he owned land bordering upon Booth and Spaulding's pond, which was liable to encroachment if the dam was higher than it should be ; and thus he was interested to reduce its height.

The County Court seems to have admitted the declarations of Dewey, upon the ground that the act of cutting down the dam and the contemporary declaration tended to show that Booth and Spaulding acquiesced in Dewey's claim, that the dam was too high ; but no right based upon the ground of acquiescence was claimed by the plaintiff, and none could be under the facts appearing. The evidence was left to work its injurious consequences upon the defendant's title, as shown by their deeds.

*Judgment reversed.*